1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

B.G., a minor, by and through her parent
and legal guardian, TIFFANY ST. JOHN,

                 Plaintiff,

     v.

STANLEY STEEMER
INTERNATIONAL, INC.,

                 Defendant.

CASE NO. 2:24-cv-02105-TL

ORDER ON MOTION FOR
DEFAULT JUDGMENT

       This matter is before the Court on Plaintiff's Motion for Default Judgment. Dkt. No. 15.

Defendant has not appeared or otherwise participated in this case. On January 29, 2025, the

Clerk of Court entered Defendant into default. Dkt. No. 12. Having reviewed the relevant record,

the Court GRANTS Plaintiff's motion.

## I.    BACKGROUND

       This is a personal-injury case that arose out of an automobile accident that allegedly took

place on Interstate 5 in Seattle, Washington. Dkt. No. 1 (Complaint) ¶ 9. Plaintiff is Bailey

Gonzalez,[1] a citizen of Washington. *Id.* ¶ 4. Defendant is Stanley Steemer International, Inc., an Ohio corporation with its principal place of business in Ohio. *Id.* ¶ 5. Defendant is in the carpet-cleaning business. *See Fleetwood v. Stanley Steemer Int'l, Inc.*, 725 F. Supp. 2d 1258, 1262 (E.D. Wash. 2010).

On June 16, 2023, Plaintiff was traveling southbound on Interstate 5 in Seattle, Washington. Dkt. No. 1 ¶ 9. At the same time, Jules Purnell IV, whom Plaintiff identifies as "[a]n agent of Defendant," was also headed southbound on Interstate 5 in Seattle in the same lane as Plaintiff, "driving a van owned by Stanley Steemer and operated within the course and scope of his employment with Stanley Steemer." *Id.* ¶¶ 10–11. Traffic "came to a complete stop." *Id.* ¶ 11. Plaintiff reacted and "stop[ped] behind the car in front of her." *Id.* ¶ 12. Purnell, however, was directly behind Plaintiff and "failed to stop" with traffic. *Id.* ¶ 13. Purnell's van collided with the rear end of Plaintiff's vehicle, the force of which pushed Plaintiff's vehicle forward and caused a second rear-end collision between Plaintiff's vehicle and the car in front of it. *Id.* ¶ 14. After the accident, Washington State Patrol cited Purnell for following too closely. *Id.* ¶ 15.

Plaintiff sustained injuries as a result of the collisions, "impact[ing] her ability to perform day-to-day functions, focus in school, and maintain employment." *Id.* ¶ 16. Plaintiff's injuries are permanent: Plaintiff can no longer play soccer "or any other organized sport," and Plaintiff "struggles to walk or stand for extended periods of time." *Id.* ¶¶ 17–19. Plaintiff also "experiences frequent dizziness and debilitating migraines." *Id.* ¶ 19.

On December 19, 2024, Plaintiff filed a civil action against Defendant, alleging one claim of negligence. *Id.* ¶ 20. On December 26, 2024, Plaintiff served process on Defendant. *See* Dkt.

---

[1] Because Plaintiff turned 18 on February 10, 2025, and reached the age of majority, Plaintiff avers that it is no longer necessary to refer to her by her initials. *See* Dkt. No. 15 at 4 n.1.

No. 7 (declaration of service). Defendant, who has not appeared in this case, did not answer or otherwise respond to Plaintiff's complaint. Defendant has not participated in this case at all. On January 24, 2025, Plaintiff moved for an entry of default against Defendant. Dkt. No. 10. On January 29, 2025, the Clerk Of Court entered Defendant into default (Dkt. No. 12), and Plaintiff was given 90 days—until April 29, 2025—to move for default judgment (Dkt. No. 13). On April 29, 2025, Plaintiff filed the instant motion for default judgment. Dkt. No. 15.

## II.    LEGAL STANDARD

A court's decision to enter a default judgment is discretionary. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Default judgment is "ordinarily disfavored," because courts prefer to decide "cases on their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986) (affirming district court's denial of default judgment). When considering whether to exercise discretion in entering default judgments, courts consider a variety of factors, including:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of a plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id.* at 1471–72. "None of the factors is dispositive in itself; instead, [courts] must balance all seven." *Indian Hills Holdings, LLC v. Frye*, 572 F. Supp. 3d 872, 884 (S.D. Cal. 2021); *e.g.*, *Bd. of Trs. of San Mateo Hotel Emps. & Rest. Emps. Welfare Fund v. H. Young Enters., Inc.*, No. C08-2619, 2009 WL 1033665, at *4–5 (N.D. Cal. Apr. 13, 2009) (finding second and third *Eitel* factors dispositive when deciding to enter default judgment).

Courts reviewing motions for default judgment must accept the allegations in the complaint as true, except for those regarding facts related to the amount of damages. *Geddes v.*

*United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992); *accord Little v. Edward Wolff & Assocs. LLC*, No. C21-227, 2023 WL 6196863, at *3 (W.D. Wash. Sept. 22, 2023) (quoting *Cripps*, 980 F.2d at 1267). Damages are also limited to what was reasonably pleaded. Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

### III.    DISCUSSION

**A.    Jurisdiction**

As an initial matter, the Court "has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

**1.    Subject-Matter Jurisdiction**

The Court has diversity subject-matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Washington. Dkt. No. 1 ¶ 4. Defendant is incorporated in Ohio and maintains its principal place of business in Ohio. *Id.* ¶ 5. There is thus diversity of citizenship between the Parties. *See* 28 U.S.C. § 1332(c)(1). Further, the amount of money in controversy exceeds $75,000. Dkt. No. 1 ¶ 7; *see also* Dkt. No. 15 at 17 (demanding $5,875,000 in damages).

**2.    Personal Jurisdiction**

The Court may properly exercise specific personal jurisdiction over Defendant. "In a diversity action in Washington, a federal court has personal jurisdiction over a non-Washington-resident defendant if permitted by Washington's long-arm statute, because Washington's long-arm statute comports with the federal due-process requirements." *Hunter v. Ferebauer*, 980 F. Supp. 2d 1251, 1256–57 (E.D. Wash. 2013). Under Washington's long-arm statute, a person

submits to the jurisdiction of Washington courts if they, or their agent, "commi[t(s)] . . . a

tortious act within [the] state." RCW 4.28.185(1)(b). Further,

> [t]hree factors must coincide for the long-arm statute to apply,
> which encompasses both the statutory and due process concerns of
> exercising personal jurisdiction: (1) the nonresident defendant or
> foreign corporation must purposefully do some act or consummate
> some transaction in the forum state; (2) the cause of action must
> arise from, or be connected with, such act or transaction; and
> (3) the assumption of jurisdiction must not offend traditional
> notions of fair play and substantial justice, considering the quality,
> nature, and extent of the activity in the forum state, the relative
> convenience of the parties, the benefits and protections of state
> laws afforded the respective parties, and the basic equities of the
> situation.

*Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 650, 336 P.3d 1112 (2014).

Here, as alleged in the complaint, Defendant is licensed to conduct business in

Washington. Dkt. No. 1 ¶ 6. The accident at issue involved Purnell, an "agent" of Defendant who

was driving a vehicle owned by Defendant. *Id.* ¶ 10. At the time the accident occurred, Purnell

was "operat[ing] within the course and scope of his employment with" Defendant. *Id.* That is to

say, while Defendant was doing business in Washington, and an employee of Defendant was on-

the-job, engaging in that business, Defendant's agent injured Plaintiff. Further, exercising

jurisdiction here would comport with fair play and substantial justice. The accident occurred in

Washington, Plaintiff sustained her injuries in Washington, and Washington negligence law

applies to the alleged misconduct. Moreover, Plaintiff is a citizen of Washington. *See Pruczinski*

*v. Ashby*, 185 Wn.2d 492, 505, 372 P.3d 102 (2016) ("We cannot say that it offends traditional

notions of fair play and substantial justice to exercise jurisdiction over an alleged tortfeasor when

the tort and the injury occur in this state.").

**B.    Default Judgment**

Considering the *Eitel* factors, the Court finds that entry of default judgment is warranted.

1

2    **1.    Factor One: Prejudice to Plaintiff**

3    "The first *Eitel* factor considers whether the plaintiff will suffer prejudice if default

4    judgment is not entered." *GS Holistic, LLC v. City Smoke Corp.*, No. C24-1286, 2025 WL

5    1345083, at *2 (W.D. Wash. May 8, 2025). Without entry of default judgment, Plaintiff will be

6    prejudiced. Plaintiff has attempted to litigate this case and vindicate her rights against Defendant.

7    But Defendant has failed to appear or participate in this litigation, despite having been properly

8    served. "Without default judgment, Plaintiff will suffer prejudice because she will 'be denied the

9    right to judicial resolution' of her claim and will be 'without other recourse for recovery.'" *Id.*

10    (quoting *Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005)).

11    Therefore, the first *Eitel* factor weighs in favor of entering default judgment.

12    **2.    Factors Two and Three: Merits of Plaintiff's Claim and Sufficiency of
       Complaint**

13    The second and third *Eitel* factors examine "the substantive merits of the plaintiff's claim

14    and the sufficiency of the plaintiff's complaint." *Id.* In the Ninth Circuit, these factors are

15    frequently analyzed together. *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175

16    (C.D. Cal. 2002) (explaining how the Ninth Circuit has suggested that the second and third *Eitel*

17    factors require a plaintiff to state a claim on which they can recover). These factors weigh in

18    favor of an entry of default judgment if the allegations in a complaint sufficiently state a claim

19    upon which relief can be granted. *See Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

20    Courts apply the *Iqbal-Twombly* standard, where a complaint is sufficient if it "contain[s]

21    sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

22    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

23    570 (2007)). Here, taking the allegations in Plaintiff's complaint as true, Plaintiff has alleged a

24    potentially meritorious claim of negligence against Defendant.

1    In Washington, to establish negligence, a plaintiff must show four elements: "'(1) the

2    existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause.'"

3    *Stanley v. Sierra Pac. Land & Timber*, 567 P.3d 1161, 1168 (Wash. Ct. App. 2025) (quoting

4    *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)). Plaintiff's

5    complaint sufficiently alleges all four elements.

6    As to the first and second elements—duty and breach—under RCW 46.61.400(1), "speed

7    shall be so controlled as may be necessary to avoid colliding with any person, vehicle or other

8    conveyance on or entering the highway in compliance with legal requirements and the duty of all

9    persons to use due care." Plaintiff alleges that Purnell, Defendant's agent, "failed to follow the

10   rules of the road under RCW 46.61" and "fail[ed] to exercise due care and caution." Dkt. No. 1

11   ¶ 22. Given the allegation that Purnell's vehicle struck Plaintiff's vehicle, the complaint

12   plausibly alleges that Purnell breached his duty of care to other drivers, including Plaintiff, when

13   he failed to stop when traffic around him had "c[ome] to a complete stop."[2] As to the third and

14   fourth elements, Plaintiff sufficiently pleads causation, alleging that: (1) Purnell rear-ended her;

15   and (2) because of the collision, Plaintiff "sustained injuries . . . that continue to impact her

16   ability to perform day-to-day functions, focus in school, and maintain employment." *Id.* ¶¶ 13,

17   16. With respect to injury, Plaintiff alleges "permanent harm" such that she "now struggles to

18   walk or stand for extended periods of time, and experiences frequent dizziness and debilitating

19   migraines." *Id.* ¶¶ 17, 19.

20   Therefore, the second and third *Eitel* factors weigh in favor of entering default judgment.

21

22   _____

[2] Neither the collision nor Purnell's subsequent citation for following too closely establish that Defendant breached its duty of care as a matter of law. *See James v. Niebuhr*, 63 Wn.2d 800, 802, 389 P.2d 287 (1964) (rear-end collision does not necessarily indicate negligence on the part of the trailing driver); *Billington v. Schaal*, 42 Wn.2d 878, 882, 259 P.2d 634 (1953) (traffic citation does not prove recipient's guilt as to the cited misconduct and is thus not necessarily indicative of negligence). But the second and third *Eitel* factors examine only whether Plaintiff has stated a claim, not proved her case.

1

2      ### 3.      Factor Four: Sum of Money at Stake

3          The fourth *Eitel* factor requires the Court to "consider the amount of money at stake in

4      relation to the seriousness of the [d]efendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176.

5      "[W]hen the sum of money at stake is tailored to the specific misconduct of the defendant,

6      default judgment may be appropriate." *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1100 (N.D. Cal.

7      2014). Here, Plaintiff seeks $5,875,000. Dkt. No. 15 at 17.

8          The sum of money at stake here is large, particularly in relation to the seriousness of

9      Defendant's alleged conduct. *See Kaur v. Singh*, No. C13-89, 2015 WL 5330294, at *4 (E.D.

10     Cal. Sept. 10, 2015) (finding that $3 million in damages in wrongful-death case weighed against

11     entry of default judgment); *cf. Long v. Okopny*, No. C20-2211, 2021 WL 12311910, at *2 (D.

12     Ariz. Nov. 2, 2021) (finding $5 million in damages "proportional" to misconduct in wrongful-

13     death and gross-negligence lawsuit where misconduct was the "intentional sho[oting] and

14     kill[ing]" of the plaintiff's daughter).

15         Therefore, the fourth *Eitel* factor weighs against entering default judgment.

16     ### 4.      Factor Five: Possibility of Dispute of Material Facts

17         There is little possibility that the core, material facts are in dispute. "When default has

18     been entered, courts find that there is no longer the possibility of a dispute concerning material

19     facts because the court must take the plaintiff's factual allegations as true." *Curtis v. Illumination

20     Arts, Inc.*, 33 F. Supp. 3d 1200, 1212 (W.D. Wash. 2014). "Where the moving party 'has

21     supported its claims with ample evidence, and [the defaulting party] has made no attempt to

22     challenge the accuracy of the allegations in the complaint, no factual disputes exist that preclude

23     the entry of default judgment.'" *Jung v. Liberty Mut. Fire Ins.*, No. C22-5127, 2023 WL

24     3204595, at *4 (W.D. Wash. May 2, 2023) (quoting *Landstar Ranger, Inc. v. Parth Enters., Inc.*,

725 F. Supp. 2d 916, 922 (C.D. Cal. 2010)). Here Defendant's nonappearance has let Plaintiff's allegations go unchallenged. *See* Dkt. No. 16-1 (Traffic Collision Report) at 2–6.

Therefore, the fifth *Eitel* factor weighs in favor of entering default judgment.

### 5.    Factor Six: Whether Default is Due to Excusable Neglect

The sixth *Eitel* factor considers whether Defendant's default can be attributed to excusable neglect. "There is little possibility of excusable neglect when the plaintiff properly serves the defendant and the defendant is aware of the litigation." *Mesa Underwriters Specialty Ins. Co. v. Hulett*, No. C21-8284, 2022 WL 17218505, at *6 (C.D. Cal. Oct. 26, 2022). Here, a process server served Defendant with the complaint on December 26, 2024. *See* Dkt. No. 7. The process server attested that they personally served Defendant's "Registered Agent, who is authorized to receive service." *Id.* Thus, Defendant's default is not the result of excusable neglect.

Therefore, the sixth *Eitel* factor weighs in favor of entering default judgment.

### 6.    Factor Seven: Strong Policy in Favor of Decision on the Merits

The Court maintains a strong policy preference in favor of resolution of Plaintiff's claims on the merits. Whenever it is reasonably possible, courts should decide cases upon their merits. *See Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). But "this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177. Federal Rule of Civil Procedure 55(a) "allows a court to decide a case before the merits are heard if defendant fails to appear and defend." *Landstar Ranger*, 725 F. Supp. 2d at 922. Here, Defendant has not appeared and has not participated in this case, let alone defended itself, in any way. *See* Dkt. No. 12.

Therefore, "[s]ince [D]efendant failed to respond to [P]laintiff's claims, the seventh *Eitel* factor does not preclude the entry of default judgment against it." *Landstar Ranger*, 725 F. Supp. 2d at 922.

1

\*      \*      \*

Only one of the *Eitel* factors—the sum of money at stake—weighs against entering

default judgment. The Court thus concludes that default judgment against Defendant is

appropriate in this case. *See Bhatia v. United States*, No. C19-2313, 2025 WL 1482431, at \*4

(E.D. Cal. May 23, 2025) (recommending entry of default judgment where only fourth *Eitel*

factor weighed against it); *McKesson Med.-Surgical Inc. v. Custom Glass & Synthetic Design,*

*LLC*, No. C21-1471, 2021 WL 6112866, at \*3 (D. Ariz. Dec. 27, 2021) (entering default

judgment under same circumstances).

## C.    Damages

Under Rule 54(c), "[a] default judgment must not differ in kind from, or exceed in

amount, what is demanded in the pleadings." Further, Plaintiff "is required to present evidence to

'prove up' the damages that [s]he is seeking." *Olive v. Robinson*, No. C20-356, 2023 WL

346622, at \*7 (W.D. Wash. Jan. 20, 2023) (first citing *Amini Innovation Corp. v. KTY Int'l*

*Mktg.*, 768 F. Supp. 2d 1049, 1053–54 (C.D. Cal. 2011), then citing Fed. R. Civ. P. 55(b), then

citing LCR 55(b)(2)). "Plaintiff must support a motion for default judgment with a declaration

and other evidence establishing plaintiff's entitlement to a sum certain and to any nonmonetary

relief sought." LCR 55(b)(2).

Plaintiff seeks $5,875,000 in total damages. Dkt. No. 15 at 14. This sum represents:

- $22,021.53 in past special damages—i.e., Plaintiff's medical expenses;

- $1,958,411.40 in future special damages—i.e., wage loss, loss of earning
capacity, and life care plan; and

- $3,894,567.07 in general damages.

*Id.* at 13–14. The Court will discuss these line items in turn.

1

### 1.    Past Special Damages

2      As to the past special damages, Plaintiff does not provide any substantiating

3 documentation to support the claim. Plaintiff's counsel asserts in a declaration that Plaintiff has

4 "collected the billing records from [her] care providers," and that "[t]o date, [Plaintiff] has been

5 billed $22,021.53 in past medical expenses from Seattle Children's Hospital ($10,963.40), Mill

6 Creek Chiropractic Clinic ($2,364.78), Everett Clinic ($1,163.25) and Integrated Rehabilitation

7 Group ($7,530.10)." Dkt. No. 16 (Pittman Decl.) ¶ 17. But collecting billing records is not the

8 same thing as providing them to the Court. Plaintiff's obligation is to:

9          provide a concise explanation of how all amounts were calculated,
           *and* [to] support this explanation with evidence establishing the
10         entitlement to and amount of the principal claim, and, if applicable,
           any liquidated damages, interest, attorney's fees, or other amounts
11         sought. If the claim is based on a contract, plaintiff shall provide
           the court with a copy of the contract and cite the relevant
12         provisions.

13 LCR 55(b)(2)(A) (emphasis added). Plaintiff does not explain why she has stopped short of

14 providing these billing records to the Court, and she does not provide authority indicating that

15 "collecting" the records and having them on hand satisfies her evidentiary burden. *Cf. Waters v.*

16 *Mitchell*, No. C21-87, 2023 WL 3304217, at *11 (W.D. Wash. May 8, 2023) (awarding damages

17 where plaintiff "provide[d] invoices for healthcare he received").

18      Therefore, the Court DENIES Plaintiff's request for past special damages.

19 ### 2.    Future Special Damages

20      To substantiate her claim for future special damages, Plaintiff has submitted a report

21 prepared by Cloie B. Johnson, identified as a Vocational Rehabilitation Counselor/Case

22 Manager. Dkt. No. 16-6.[3] Johnson breaks down future special damages into three categories:

23

24 ───────────────

[3] Johnson's expert opinion is the only evidence on the record on the issue of future special damages, and given that
Defendant has defaulted, Johnson's opinion is unchallenged. The Court accepts the expert report for purposes of

1    wage loss, loss of earning capacity, and life care plan. *Id.* at 21. Within the second and third

2    categories, Johnson provides a range, from "best case"—where Plaintiff's injuries have a lower

3    economic impact on her life—to "worst case"—where Plaintiff's injuries have a higher

4    economic impact on her life. *Id.* In the "best case," Plaintiff's future special damages total

5    $1,451,519.60. *Id.* In the absolute "worst case,"[4] Plaintiff's future special damages total

6    $2,465,303.20. *Id.*

7        In preparing the report, Johnson reviewed Plaintiff's medical and psychological records.

8    *Id.* at 3–13. Johnson indicates that she met personally with Plaintiff and administered various

9    diagnostic tests, including the Career Ability Placement Survey ("CAPS") and Career

10    Occupational Preference System ("COPS"). *Id.* at 13–15. These examinations "interlink

11    aptitudes and interests across fourteen occupational clusters, allowing identification of specific

12    occupations, career paths and resources." *Id.* at 14. Roughly speaking, CAPS addresses the

13    subject's abilities, while COPS addresses the subject's interests. *Id.* at 14–15. Johnson also

14    reviewed Plaintiff's educational and occupational background. *Id.* at 13–14.

15            a.    ***Wage Loss and Loss of Earning Capacity***

16        Johnson provides "a determination of [Plaintiff's] ability to work and earn money." *Id.* at

17    15. Johnson explains that, "Through the use of well researched and time-tested vocational

18    techniques that have been relevant and reliable, Vocational Experts can provide objective

19    information to determine an individual's ability to work and earn wages." *Id.*

20        In Johnson's assessment, wage loss accounts for Plaintiff's future special damages

21    through age 29. Johnson opines that Plaintiff "will experience wageloss [*sic*] through age 29

22

23    default judgment because a court "may not act arbitrarily in disregarding uncontradicted and entirely probable testimony whose qualifications and judgment have not been discredited." *Security-First Nat'l Bank of L.A. v. Lutz*, 322 F.2d 348, 355 (9th Cir. 1963).

24    [4] Johnson's worst-case scenario encompasses a range.

totaling [*sic*] $333,300.00" *Id.* at 16. This figure is based on Johnson's presumption that, prior to the accident, Plaintiff would have likely obtained an associate's degree, then worked full time between the ages of 18 and 29. *See id.* With such educational attainment, had Plaintiff not been injured, her "[a]nnual earnings by age" would have been $51,700.00 for ages 18 to 24, and $60,940.00 for ages 25 to 29. *Id.* Because Plaintiff is now forced to undergo "treatment to address the sequelae of impairments" and will suffer from "residual impairments of the injuries," however, Plaintiff's "earning capacity will remain limited in access and placeability. She will likely experience wageloss [*sic*] as a result of the treatment needs and impairments." *Id.* Plaintiff's "capacity will be best suited for part-time employment during efforts for academic success." *Id.* Plaintiff can thus expect to earn only a fraction of the $51,700 and $60,940 figures cited by Johnson.

Loss of earning capacity accounts for Plaintiff's damages between the ages of 29 and 67, the age at which Johnson presumes Plaintiff will stop working. *See id.* Johnson bases her assessment on a presumption that Plaintiff's pre-injury earning capacity was $77,980.00 per annum, which is what "males working full time year round with an Associate's degree earn." *Id.* Johnson presupposes that Plaintiff would work full-time until age 67. *Id.*

Johnson first provides a "best case scenario," in which Plaintiff "complete[s] the education she had the capacity to complete pre-injury," but where "her wage earning capacity [is] limited to entry level wages best reflected in the earnings data of those age[d] 25 to 29." *Id.* at 17. Plaintiff's earnings would be limited to $59,670.00 per annum—$18,310 less than her pre-earning capacity. *Id.* Over 38 years of working (i.e., ages 29 to 67), Plaintiff's "total loss of earning capacity is $695,780 . . . ." *Id.*

Johnson expresses "worst case scenario" damages as a range. On the low end, Plaintiff's "academic and employment efforts" "will not be successful beyond what [Plaintiff] has

demonstrated to date." *Id.* Plaintiff "will be relegate[d] . . . to entry level employment . . . within her functional capacity which pay at or about minimum wage ($16.66 per hour, $34,652.80 annually)." *Id.* On the high end, Plaintiff will be able to match the "earnings of an individual with Some College ($57,010.00 annually)." *Id.* Based on Plaintiff's pre-injury earning capacity, this represents an annual loss of between $20,970.00 and $43,327.20, which yields, over 38 years, a total worst-case-scenario loss of earning capacity of between $796,860.00 and $1,646.433.60. *Id.*

### b.    *Life Care Plan*

Johnson opines that Plaintiff's "condition and sequelae will require ongoing medical, rehabilitation, and durable medical equipment needs over her lifetime to enable her to maintain her life roles and responsibilities as an adult woman." *Id.* at 17. In assessing damages, Johnson "researched and identified providers, costs and frequencies of replacement for the identified equipment and items." *Id.* Johnson avers that the "Life Care Plan is reflective of information obtained from the available medical records," as well as Johnson's consultations with Plaintiff and Plaintiff's providers, and Johnson's "specialized knowledge, training, experience and clinical judgment." *Id.* at 18. All told, based on Johnson's presumption that Plaintiff will live another 62.47 years, Plaintiff's life care plan would cost $422,439.60 in a best-case scenario and $485,569.60 in a worst-case scenario. *Id.* at 21.

*        *        *

Evidence indicates that, in the two years prior to the accident, Plaintiff was "an average to above average student." Dkt. No. 16-6 at 13. Therefore, the Court will apply the midpoint(s) of Johnson's assessments to determine damages here.

- Wage loss is **$333,300.00.**

- With respect to lost earning capacity, the best-case scenario is $695,780. The midpoint of the worst-case scenario (which Johnson has expressed as a range) is $1,221,646.80. The midpoint between best- and worst-case scenarios is thus **$958,713.40.**

- With respect to the life care plan, the best-case scenario is $422,439.60. The worst-case scenario is $485,569.60. The midpoint between best- and worst-case scenarios is thus **$454.004.60.**

- The total future special damages are thus **$1,746,018.00.**

Accordingly, the Court AWARDS Plaintiff future special damages of $1,746,018.00.

### 3.    General Damages

As to general damages, Plaintiff also provides a declaration from Lafcadio Darling (Dkt. No. 17), an attorney licensed to practice in this District, among other jurisdictions.[5] *Id.* ¶ 2. Darling purports to have 23 years of experience representing "many different types of clients on a wide variety of matters, including civil litigation of all types, personal injury litigation, maritime/admiralty, commercial disputes, and other similar matters." *Id.* ¶ 3. Darling also avers that he has served as a settlement guardian ad litem ("SGAL") and litigation guardian ad litem (LGAL) "for the past 12+ years." *Id.* ¶ 4. Darling advises that he "provide[s] an opinion and input regarding the assessment of general damages for the purposes of entering judgment based on [his] experience as a litigation and trial attorney, LGAL, and SGAL." *Id.* ¶ 7.

Darling opines that, "[i]n the context of a default judgment, . . . it is reasonable to consider a general damages multiplier for assessing the reasonableness of the damages, supplemented by the individual facts and circumstances of the plaintiff, incident, and damages claimed." *Id.* ¶ 10. In Darling's experience, the "'standard' multiplier for general damages in personal injury cases ranges anywhere from two to five times the special damages requested." *Id.*

---

[5] As with Johnson, the Court accepts Darling's declaration regarding general damages for purposes of default judgment as it is unchallenged. *See supra* n.3

¶ 11. Upon review of the records here, Darling asserts that "a 2x multiplier is reasonable in [Plaintiff's] case given the permanent traumatic brain injury (TBI) and orthopedic injuries that [Plaintiff] sustained from high-speed rear-end collision." *Id.* ¶ 12. Based on Plaintiff's claims of $22,021.53 in past special damages, $1,958,411.40 in future special damages, Darling opines that $3,894.567.07 in general damages is appropriate. *Id.* ¶ 18. This actually represents a "multiplier" of 1.97.

The Court does not award Plaintiff past special damages and awards $1,746,018.00 in future special damages. Applying a multiplier of 1.97 to that figure yields general damages of $3,439,655.46. Therefore, the Court AWARDS Plaintiff general damages of $3,439,655.46.

## IV.    CONCLUSION

Accordingly, Plaintiff's Motion for Default Judgment (Dkt. No. 15) is GRANTED. It is hereby ORDERED:

(1)    Judgment is ENTERED as to all claims.

(2)    Plaintiff is AWARDED future special damages of $1,746,018.00.

(3)    Plaintiff is AWARDED general damages of $3,439,655.46.

(4)    Interest SHALL accrue at the statutory rate from the date of judgment.

(5)    The Court RETAINS jurisdiction over this case for the purpose of enforcing this Order, and for any supplemental proceedings that may be authorized by law.

(6)    Plaintiff's counsel is DIRECTED to serve a copy of this Order on Defendant.

Dated this 3rd day of July 2025.

Tana Lin
United States District Judge